**In re the Marriage of Helen L. PETERSON, petitioner, Respondent,**

**v.**

**Ralph W. PETERSON, Appellant.**

**No. C8–84–1714.**

Court of Appeals of Minnesota.

May 7, 1985.

Review Denied July 17, 1985.

Thomas A. Roe, Minneapolis, for appellant.

Diane Vlassis, Minneapolis, for respondent.

Heard, considered and decided by RANDALL, P.J., and SEDGWICK and HUSPENI, JJ.

## OPINION

SEDGWICK, Judge.

This appeal is from a dissolution judgment. The two major issues litigated at trial were the valuation of appellant's interest in his law practice and the determination of respondent's need for spousal maintenance. We affirm in part and reverse in part.

## FACTS

Appellant Ralph Peterson, 59, is a partner with the Minneapolis law firm of Eastlund, Peterson & Solstad, Ltd. Respondent Helen Peterson, 53, has basically been a mother and homemaker throughout her nearly 24-year marriage. She has no formal education beyond high school.

Appellant joined the law firm formerly called Johnson and Eastlund in 1969 as an associate. After the death of attorney George Johnson in 1981, appellant became a partner of the firm. In 1982 the firm changed its name to Eastlund, Peterson & Solstad.

Both parties employed experts to testify as to the value of appellant's one-third interest in his law practice. The law firm has no buy-sell agreement.

Respondent's expert, Stephen Dennis, a certified public accountant and tax attorney, valued appellant's interest in his law practice by using financial statements provided by the law firm. From these balance sheets adjustments were made to reflect assets of the law firm such as accounts receivable, work in progress, the value of contingent fee cases, and the firm's liabilities such as accounts payable and appellant's debts to the firm.

Dennis determined the value of appellant's interest in his law practice at two different times. In February 1984, he determined appellant's interest to be $55,000. In April 1984, he determined appellant's interest to be $56,000.

Appellant's expert, Howard Guthman, a certified public accountant, determined appellant's interest in his law practice to be worth zero. He based this opinion upon "common sense and management practices." He admitted he did not review the firm's financial documents in connection with this litigation, nor had he read any case law concerning the valuation of businesses in a marriage dissolution proceeding.

The trial court determined appellant's interest in his law firm to be worth $51,500. Respondent was awarded spousal maintenance of $1,200 per month beginning in July, 1984. Upon sale of the parties' homestead, ordered to be placed on the market in September, 1984, and satisfaction of respondent's property interest, the spousal

maintenance amount is to be reduced to $900 per month to continue through January, 1990.

### ISSUES

1. Did the trial court err in determining the value of appellant's interest in his law practice to be $51,000?

2. Did the trial court err in denying long-term spousal maintenance to respondent?

### ANALYSIS

■ 1. The trial court's valuation of marital property will not be overturned in the absence of a clear abuse of discretion or an erroneous application of law. *Servin v. Servin*, 345 N.W.2d 754, 758 (Minn.1984). "Exactitude is not required of the trial court in the valuation of assets; * * * it is only necessary that the value arrived at lies within a reasonable range of figures." *Johnson v. Johnson*, 277 N.W.2d 208, 211 (Minn.1979) (cites omitted).

There is no Minnesota case that concerns the valuation of a law firm where a buy-sell agreement does not exist, as is the case here.

Appellant claims the trial court was without authority in finding respondent's expert properly valued appellant's interest in the law firm at $51,500. Specifically, appellant claims the trial court erred in failing to reduce the law firm's assets by the amount of the law firm's future rent due on the remainder of the five-year lease and a $36,000 debt owing to Norma Johnson.

Respondent's expert based his valuation upon consideration of the following: the firm's assets which included the shareholder's equity, accounts receivable, work in progress, and known contingency fee settlement offers. He also considered the firm's liabilities such as the accounts payable, and made adjustments to reflect the possible uncollectability and aging of the accounts receivable and work in progress.

*Obligation to Norma Johnson*

■ Respondent contends the $36,000 debt owed to Norma Johnson is not a valid debt of the Eastlund, Peterson, & Solstad firm. Norma Johnson is the widow of George Johnson, a partner of Johnson and Eastlund, the predecessor firm to Eastlund, Peterson, & Solstad. After her husband's death, Mrs. Johnson brought a claim against Mr. Eastlund claiming that she was entitled to compensation for her husband's interest in the partnership.

Her claim was resolved by a settlement, evidenced by a promissory note signed by Mr. Eastlund and his wife as individuals.

Appellant presented evidence in the form of a corporate resolution indicating that the Eastlund, Peterson & Solstad firm assumed Mr. Eastlund's obligation to Norma Johnson. This resolution was adopted after Peterson had been made aware that the valuation of his interest in his law practice would be at issue in his dissolution proceeding. The resolution was adopted approximately two years after the firm's incorporation and five months prior to the Peterson dissolution trial.

This obligation was absent from the firm's balance sheets when respondent's expert first reviewed the firm's financial documents approximately four months before trial. It inexplicably appeared on the firm's balance sheets three months later when respondent's expert again reviewed the firm's financial documents.

It is clear that Norma Johnson was not notified of this alleged assumption of the obligation. In light of the circumstances, the trial court did not abuse its discretion by concluding the obligation to Norma Johnson was a personal obligation of Mr. Eastlund and not a legitimate liability of the Eastlund, Peterson & Solstad law firm.

*Future Lease Obligation*

■ Appellant contends the trial court erred in accepting respondent's expert's valuation because he failed to consider the future lease obligation of the law firm. *Goldstein v. Goldstein*, 120 Ariz. 23, 583 P.2d 1343 (1978), specifically addressed the issue of whether future overhead expenses should be considered in the valuation of a business in a marriage dissolution proceed-

ing. In *Goldstein* the husband's interest in his medical practice was at issue.

The Arizona Supreme Court held the trial court correctly did not deduct an overhead allowance for either the corporation's checking account or the accounts receivable. The court reasoned that:

"[s]ince the trial court must establish a *present* value for each asset in order to make an equitable distribution, it properly is not concerned with possible future debts which may or may not come into existence.

\* \* \* \* \* \*

The overhead incurred in generating the balance currently in the checking account and accounts receivable has either been paid, thereby reducing the checking account, or is present in the form of an incurred debt. In either case, the past overhead which generated these assets would be reflected in the present value of the corporation. To then subtract future overhead expenses would amount, in essence, to a double deduction from the same assets."

*Goldstein,* 583 P.2d at 1344, 1345.

In light of this authority, the trial court did not err in accepting respondent's expert's valuation which excluded future rent obligations in determining the present value of the law firm. Therefore, the judge's findings, based upon all the evidence, is well "within a reasonable range of figures." *Johnson v. Johnson,* 277 N.W.2d 208, 211 (Minn.1979).

2. Respondent contends the trial court abused its discretion in denying long-term spousal maintenance. She was awarded spousal maintenance of $1,200 per month beginning immediately. Upon sale of the parties' homestead, ordered to be placed on the market within a month of the dissolution decree, and satisfaction of her property interest, spousal maintenance is to be reduced to $900 per month to continue through January, 1990. In 1990 respondent will be 59 years old and contends she will be unable to meet her financial needs. She requests this court remand for an order continuing maintenance until appellant

retires from the practice of law, at which time the issue of maintenance be reserved.

Trial Court Finding XI provides:

Mr. Eugene Hogenson, licensed psychologist, testified that (Respondent) does not have the capacity to tolerate the psychological and physical stress of full-time permanent employment. Mr. Hogenson based his conclusions upon (Respondent's) personality, the factors of stress in her life, and her personal and employment history.

Finding XIV provides:

(Respondent) is in need of an award of rehabilitative spousal maintenance (alimony). The court considered (Respondent's) age, her lack of education, training and work experience and her psychological and physical impediments to full time employment. (Respondent) needs to acquire training and work experience to be able to adequately support herself in the commercial marketplace. The court bases this finding upon the length of the parties' marriage, the living established during that marriage, the earnings of the parties, their respective monthly living expenses and (Respondent's) inability to maintain full-time employment.

Minn.Stat. § 518.552, subd. 2 (1982), sets forth the factors to be considered by the trial court in setting the amount and duration of maintenance.

The most recent cases addressing these issues are *McClelland v. McClelland,* 359 N.W.2d 7 (Minn.1984); and *Abuzzahab v. Abuzzahab,* 359 N.W.2d 12 (Minn.1984), filed the same day.

The court held that permanent awards of spousal maintenance are to be restricted to certain exceptional cases where there is little likelihood of the once-dependent spouse's attaining self-sufficiency.

In *McClelland* and *Abuzzahab* the court denied permanent maintenance to women who had been married 20 years during which time their college degrees and knowledge in their areas of study had become outmoded and their earning capacity

diminished. Both women had dedicated themselves to full-time homemaking and child rearing. At the time of the dissolutions the women had minor children at home and their husbands were earning in excess of $200,000 per year.

The supreme court recommended that trial judges should consider retaining jurisdiction over cases where the rehabilitation of the dependent spouse is unclear rather than to award permanent maintenance. The amount and duration of maintenance could then be revised as necessary. Permanent maintenance should only be awarded in the case of an older, dependent spouse in a lengthy "traditional" marriage where there is little likelihood that the dependent spouse will become self-sufficient.

Helen Peterson certainly fits this description. Her situation is distinguishable from *McClelland* and *Abuzzahab* in that those women had substantial formal education beyond high school, they were in good health, and they demonstrated an ability and aptitude for becoming self sufficient. Their prospects for employment were more favorable than for Helen Peterson. They also received substantial property settlements.

Helen is 54 years old, years older than the women in *McClelland* and *Abuzzahab*. She has no formal education beyond high school, has limited work experience, no marketable skills and has functioned primarily as a homemaker, wife and mother during her nearly 24-year marriage. Her earning capacity is $5.00 per hour. Unlike the women in *McClelland* and *Abuzzahab,* she is unable to hold a permanent, full-time job because of her physical and emotional conditions, according to expert testimony.

Helen's situation is more like that of the wives in *Kaste v. Kaste,* 356 N.W.2d 64 (Minn.Ct.App.1984); *Arundel v. Arundel,* 281 N.W.2d 663 (Minn.1979); and *Cashman v. Cashman,* 256 N.W.2d 640 (Minn. 1977). In each of these cases the wife, awarded permanent maintenance, had limited work experience, limited formal education, and had functioned primarily as a homemaker, wife and mother throughout a relatively long marriage.

In *Arundel,* the wife had spent most of her married life supporting her husband in his career development and raising a family. At the time of trial she was 51, had one year of college, no vocational skills, and had been out of the job market for nearly 30 years.

Her husband, 51, is a highly successful lawyer whose earning capacity and health were good. Her earning capacity and health were poor. The court recognized that a wife is entitled to maintain her standard of living to the extent that the husband is reasonably able to provide. 281 N.W.2d at 666–667.

In *Kaste* the 48-year-old wife lacked vocational skills, had been out of the job market for 22 years, and there was uncertainty whether further education would enable her to be self supporting. Therefore, this court reinstated the trial court's original grant of 23 years of maintenance until she reached 62, remarried, or died.

In *Cashman* the 51-year-old wife in poor health was awarded only $100 per month for 36 months. The supreme court held the trial court erred in denying permanent alimony because the wife was not entitled to social security benefits, had no health insurance, and had only the proceeds from the sale of the homestead to live on in old age. The husband could expect retirement income from various sources in excess of $21,000 per year.

The court found it was unreasonable to expect Mrs. Cashman to return to nursing, even if possible at this point in her life, because it would not meet her financial needs. Therefore, the court found the permanent maintenance of $500 per month was not excessive under the circumstances and will provide her with financial security in later life and the possibility of maintaining a modest home.

Helen's property settlement is approximately $60,000. Her past debts and attorneys' and expert's fees will consume approximately $15,000. Of the remaining funds

she must find new housing and retain some amount to live on after her alimony terminates in 6 years. Unlike the homemaker in *Abuzzahab,* there is not sufficient property to provide for her reasonable needs.

Her alimony will terminate three years before she reaches age 62, the age at which she can receive social security benefits if she is entitled to any. The record is unclear as to whether she will receive any kind of retirement income.

In 1983, Ralph Peterson made in excess of $80,000 per year. There is nothing in the record to indicate his earning capacity will be diminished, except his testimony that he intended to retire at age 65.

■ The court abused its discretion in terminating maintenance for this displaced homemaker when she is 59 years old because, (1) there is no evidence that she will be able to adequately support herself for the next 3 years until eligible for social security; (2) there is nothing in the record which indicates she is entitled to social security benefits. Her property settlement is not adequate to meet her needs in old age. Under the particular facts of this case, we recommend the trial court reserve jurisdiction over the maintenance issue until after January 1990.

### DECISION

We affirm the trial court's decision with respect to the valuation of Peterson's interest in the law firm. We reverse the trial court's decision with respect to spousal maintenance and remand for retention of jurisdiction of this issue in accord with this opinion.

RANDALL, Presiding Judge (dissenting).

I respectfully dissent from the majority opinion where it reverses on the question of permanent maintenance. I would uphold the trial court on both issues, property valuation and spousal maintenance.

The case, either for or against permanent spousal maintenance, is a close one. As the majority opinion properly states, Trial Court Finding XI points out that respon-dent produced expert testimony indicating no capacity to tolerate full time permanent employment. However, the majority goes on to assume that Trial Court Finding XIV supplements and corroborates Finding XI. I do not read the same correlation into the two. Trial Court Finding XIV seems to indicate that, despite the expert testimony in Finding XI, respondent is not in need of lifetime maintenance but only in need of rehabilitative spousal maintenance so as to allow her "to acquire training and work experience to be able to adequately support herself in the commercial market place."

The majority opinion refers to the two recent Supreme Court cases addressing this issue, namely *McClelland v. McClelland,* 359 N.W.2d 7 (Minn.1984) and *Abuzzahab v. Abuzzahab,* 359 N.W.2d 12 (Minn. 1984). I find the question of permanent versus lengthy rehabilitative spousal maintenance to be uniquely within the discretion of the trial court judge and not to be set aside on appeal unless a clear abuse of discretion. This is settled law and the dissent (not the part challenged by the majority) in *Abuzzahab* discusses Minnesota's long history of allowing courts discretion to award alimony (maintenance) both permanently, *Cashman v. Cashman,* 256 N.W.2d 640 (Minn.1977); and *Arundel v. Arundel,* 281 N.W.2d 663 (Minn.1979), and for lesser periods of time, *Ruzic v. Ruzic,* 281 N.W.2d 502 (Minn.1979) (6 years) but not as a matter of right, *Cooper v. Cooper,* 298 Minn. 247, 214 N.W.2d 682, 685 (1974). Included in these cases are repeated references to the sound discretion of the trial court to consider whether maintenance should be awarded at all and, if so, for how long.

The controlling statute cited by the majority, Minn.Stat. § 518.552, subd. 2 (1982) sets out in part:

The maintenance order shall be in amounts and for periods of time, *either temporary or permanent, as the court deems just,* without regard to marital misconduct, and after considering all relevant factors including: * * *

(Emphasis added.)

The trial court awarded respondent rehabilitative spousal maintenance of $1200 per

month ($14,400 a year) starting July 1, 1984, and ending January 31, 1990. If the homestead is not sold prior to 1990, respondent is guaranteed 66 months of maintenance amounting to $79,200. If the homestead is sold prior to 1990, respondent is still guaranteed $900 per month ($10,800) a year). The most years that she could be receiving the slightly reduced sum is five years and four months, thus she is guaranteed .$60,000 maintenance (2 months × $1200 + 64 months × $900).

Further, the triggering event for the reduced maintenance is the sale of the homestead, which sale will instantly result in substantial cash to respondent. Pursuant to the terms of the dissolution decree, upon the sale of the homestead, respondent will receive 50% of the adjusted net proceeds plus $25,750 from appellant's 50% share of those proceeds. That $25,750 represents her court awarded marital interest in respondent's law practice, which cash the court deferred requiring appellant to give respondent until the homestead is sold. Thus, the first $50,000 net from the sale of the homestead goes to respondent, and appellant will only share in his homestead should it net a sum in excess of $50,000. All the net over $50,000, of course, additionally benefits respondent equally with appellant.

The expert's testimony related to respondent's incapacity to tolerate *full-time* permanent employment. The expert did not deny the possibility of part-time employment, and the trial court's Finding of Fact X showed respondent grossing approximately $300 a month from part-time receptionist work at $5.00 per hour.

The trial court did order appellant to pay temporary spousal maintenance for a period of five and one-half years, which will bring him to age 65, the normal age of retirement.

Taking into account the fact that appellant was required to pay spousal maintenance in substantial sums from age 59 to age 65, and the respondent's possible capacity for part-time work, and the substantial cash she will receive upon the sale of the homestead, I feel the trial court did not clearly abuse its discretion relative to the length of spousal maintenance.

I would affirm on all issues.